**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HARRY L. GEORGE, ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION NO. 3:04-108 |
| v. ) | |
| ) | |
| GENUINE PARTS COMPANY, d/b/a ) | JUDGE KIM R. GIBSON |
| NAPA AUTO PARTS, ) | |
| Defendant. ) | |

## MEMORANDUM OPINION & ORDER

**Gibson, J.**

### I. INTRODUCTION

Now before the Court is the Motion for Summary Judgment (Document No. 26) from Defendant Genuine Parts Company, doing business as Napa Auto Parts (hereinafter "Napa" or "Defendant"). Also for the Court's consideration is the untimely Opposition (Document No. 35) of Plaintiff Harry L. George (hereinafter "George" or "Plaintiff") and Defendant's Reply (Document No. 39-2). For the reasons set forth in this Opinion, the Court shall grant Defendant's Motion.

Plaintiff filed his Complaint on May 19, 2004, stating claims under the Age Discrimination in Employment Act (hereinafter "ADEA"), 29 U.S.C. § 621 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act (hereinafter "ADA"), 42 U.S.C. § 12101, *et seq.*, the Family and Medical Leave Act (hereinafter "FMLA"), 29 U.S.C. § 2601, *et. seq.*, and the Pennsylvania Human Relations Act (hereinafter "PHRA"), 43 PA. C.S. § 951, *et seq.* At the time, George alleged that he was sixty-eight years old and had been impermissibly terminated from Defendant's employ after suffering an aneurysm in an April 2002 work-related

1

automobile accident. Document No. 1, ¶¶ 8-12. Plaintiff requested a panoply of damages, including "back pay, front pay, compensatory damages, punitive damages, liquidated damages, loss of benefits incidental to his employment, equitable and injunctive relief, costs of litigation and attorney fees." *Id.* at ¶ 33. Defendant answered the Complaint on July 15, 2004. Document No. 2. The Court's jurisdiction is based on 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b).

Defendant timely filed its Motion for Summary Judgment on March 20, 2006. By Order of the Court, Plaintiff's Response was due on or before April 19, 2006. Document No. 10. On April 19, 2006, Plaintiff's counsel, Daniel J. Iler (hereinafter "Iler"), moved for an extension of that deadline. Document No. 30. The Court granted the motion and set a revised deadline of Friday, May 19, 2006. Document No. 31. On May 16, 2006, Iler filed a second motion for an extension of time, averring a need for three additional days. Document No. 32. The Court again granted the unopposed motion and gave Iler until Monday, May 22, 2006, to file his opposition. There was no filing on May 22. Two days later, Iler filed an untimely and procedurally defective third motion for an extension of time. The Court Clerk properly removed that motion from the docket for lack of a signature and notified Iler that the motion should be resubmitted. Docket Entry Following Document No. 34. Rather than properly refiling his motion, however, Iler simply filed his Response on May 26, 2006. Document Nos. 35-38.

It is clear from Plaintiff's untimely motion that the delay is solely the fault of Attorney Iler. The Court is thus reluctant to assess the costs of this negligence against George's case. Furthermore, though the Court's analysis makes occasional reference to Plaintiff's Response and

2

the supporting documents, the resolution of Defendant's Motion does not depend on anything but what Napa has placed in the record. Defendant's third motion for an extension of time will thus be dismissed as moot.

## II. BACKGROUND AND MATERIAL FACTS NOT IN DISPUTE[1]

Napa distributes replacement parts for automobiles through a Distribution Center and network of company-owned retail outlets in the Altoona, Pennsylvania area (hereinafter "Altoona Operation"). Initially hired in 1967, Plaintiff voluntarily left Defendant's employ during a 1980 labor dispute; George returned to Napa in 1986 as a stockroom worker in the Distribution Center. At some time in the late 1990s, George began working a dual role for Napa, performing general warehouse work and also driving an assigned delivery route.

During his tenure with Defendant, Plaintiff received copies of various Napa policies, including documents detailing the company's FMLA policy and short-term disability (hereinafter "STD") policies. In accordance with those policies, Defendant has received FMLA leave and STD benefits twice between 1986 and the events leading to this lawsuit: from December 13, 1996, through January 13, 1997; and from October 6, 1999, through November 1, 1999. Both times George returned to the Distribution Center at the end of his leave with no change in pay or benefits.

On April 2, 1998, Napa received a report that Plaintiff had pulled out in front of another car,

---

[1] The factual history recounted in this section is based upon Statements of Material Facts submitted pursuant to Local Rule 56.1, any objections and counter-statements thereto, and any consistencies between the Parties' filings. Although no indentations or marks are used, the Court has, where appropriate, directly quoted the language of the Parties. Any fact not present here has been deemed by the Court to be immaterial, lacking adequate evidentiary support, disputed for purposes of the present Motion, or argumentative and not factual. Additionally, the non-moving Party concedes anything in the movant's Statement of Material Facts to which the non-moving party does not directly respond. L.R. 56.1(E). Some facts may not be in the same form as presented because the Court has concluded that the record did not support the fact as submitted.

had tailgated a second driver, and had been seen swerving back and forth in his lane. George was informed of the report and counseled about his driving. In April 2002, while driving a Napa-owned vehicle and making deliveries for Defendant, Plaintiff was involved in an automobile accident. In connection with the accident, Plaintiff broke his right arm and suffered a small stroke. George was excused from work for three days but returned to normal duty on April 29, 2002. The next day, April 30, 2002, Plaintiff reported that he had experienced shortness of breath. Dorothy Sharp, Personnel Manager/Human Resources Manager at the Altoona Operation (hereinafter "Sharp"), accompanied George to the doctor. Though released for work that same day, George did not return to Napa.

Sharp received notice on May 1, 2002, that Plaintiff had been hospitalized with an apparent abdominal aneurism. George had previously requested vacation leave on that day and Sharp granted Plaintiff leave from work commencing May 2, 2002. On May 6, 2002, Sharp delivered FMLA and STD paperwork to Plaintiff in the hospital. George was discharged from the hospital on May 10, 2002. Plaintiff subsequently completed the necessary FMLA forms, which he pre-dated May 2, 2002, and officially received FMLA leave beginning on that date. Plaintiff also completed STD paperwork, which he dated May 13, 2002. During his leave from work, Plaintiff received STD benefits consisting of 80% of his wages for the first thirteen weeks of leave and 60% of his wages for the next thirteen weeks.

On May 24, 2002, having received at least a limited work release for George, Napa sent Plaintiff a letter requesting information regarding his work status. On June 12, 2002, Sharp sent Plaintiff another letter stating that she had twice previously sent paperwork to be reviewed by his

4

physician, but had not received the completed copies. On June 19, 2002, Plaintiff had his doctor transmit the requested information to Napa. Plaintiff's doctor also sent Napa another work release on July 19, 2002. That same day, Sharp again inquired via letter about Plaintiff's return-to-work status.

On July 24, 2002, George's twelve weeks of FMLA leave entitlement expired, but Plaintiff still did not return to work. One week later, Sharp sent Plaintiff a letter detailing the expiration of his FMLA leave and stating that he was no longer entitled to job protection. The letter also notified George that his 80% STD benefits expired that day and that, beginning August 1, 2002, he would be eligible for an additional thirteen weeks of STD benefits equaling 60% of his regular earnings. Again, Sharp requested an update on Plaintiff's return-to-work status.

On September 4, 2002, Sharp sent Plaintiff a letter warning that his STD benefits for the second thirteen-week period would expire on October 30, 2002. On October 4, 2002, Sharp spoke with Mary George, Plaintiff's spouse, and informed her that Plaintiff's STD benefits would terminate on October 30, 2002. Sometime in the next few days, Sharp received a note from Plaintiff's doctor indicating that Plaintiff was released to return to work, without restrictions, on October 30, 2002.

Meanwhile, in mid-October, 2002, Defendant claims that Chris Rice, General Manager of the Altoona Operation (hereinafter "Rice"), received a company-wide directive from Napa Headquarters instructing him to reduce the Altoona Operation payroll dollars spent in the fourth quarter of 2002 by 10% from the fourth quarter of 2001. Rice apparently conferred with Richard Humphrey, Operations Manager for the Altoona Operation (hereinafter "Humphrey"), and three

5

area store managers to determine which individuals would be laid off. Rice received recommendations that he terminate three employees from the stockroom of the Distribution Center who also performed delivery work, as well as six delivery drivers from the area stores. Adopting the recommendations, Rice reduced the Altoona Operations workforce by ten positions: one customer service position at the Distribution Center; three stockroom/delivery positions at the Distribution Center; and three delivery driver positions at the area Napa stores. Rice also agreed not to fill three recently-vacated delivery positions at the stores.

According to Napa, having identified the positions to be reduced, Rice and Humphrey then considered the seniority and performance records of workers employed in those positions. The two believed that Tim Taylor (hereinafter "Taylor"), employed as a full-time stockroom driver since May 1997, had the most seniority of anyone making a delivery route and also had not incurred any traffic citations. All other stockroom delivery drivers were terminated: George, whom Rice and Humphrey believed started driving a route in June 1997; David Behe (hereinafter "Behe"), who was hired in May 2002 as a part-time delivery driver in the Distribution Center; and LeighAnne Davis (hereinafter "Davis"), who was hired as a part-time delivery driver in the Distribution Center in June 2002. In terminating Plaintiff, both Rice and Humphrey considered that his position had been vacant for almost six months. Davis and Behe were terminated on October 12 and November 8, 2002, respectively. On October 30, 2002, George reported to the Distribution Center with his work release. Humphrey explained at that time that Plaintiff's position had been eliminated and his employment terminated. Plaintiff was paid one month's severance. At no time during George's employment with Napa did Sharp, Rice, or Humphrey believe that he was substantially limited in his ability to work or in his ability to engage in any other life activities.

6

Thereafter, Taylor was responsible for all deliveries, including those formerly performed by George. Two other stockroom employees, Bill Faust (hereinafter "Faust") and Kathleen Hazlett (hereinafter "Hazlett") were retained and would drive delivery routes on an as-needed basis. Napa hired Faust as a stockroom employee on August 7, 1980; Napa hired Hazlett as a stockroom employee on May 5, 1997. In March 2003, Behe sought re-employment with Napa and was hired for a delivery driver position after the company decided that additional assistance was needed at the Distribution Center. Defendant considered Behe well-suited to the position because he had prior experience there and had not incurred any citations while driving for the company.

On July 21, 2003, Plaintiff, with the assistance of his attorney, filed a complaint with the Pennsylvania Human Relations Commission (he reinafter "PHRC") and the Equal Employment Opportunity Commission (hereinafter "EEOC"). Plaintiff received a dismissal and Notice of Rights from the EEOC and filed the instant lawsuit in May 2004.

## III. CURRENT POSTURE

### A. Factual Disputes

Certain factual issues remain in dispute. First is the level of George's seniority with Defendant. According to Napa, George worked with the Altoona Operation from 1967 until a separation in 1980 when his union went on strike and the company hired replacement workers. Defendant claims that George did not work for Napa between November 1980 and August 4, 1986. Document No. 28, ¶ 3 n.3. On the other hand, Plaintiff claims that when he was rehired in August 1986, it was with the understanding that he would enjoy all seniority previously accrued. Document No. 37, ¶ 3; George Dep. Exh. B. attached to Document No. 29, p. 58. Plaintiff testified at deposition, however that noone ever told him he would retain his prior seniority. George Dep., p.

7

58.

The Parties also dispute the date when Plaintiff began driving a delivery route. Napa claims it was June 1997. Document No. 28, ¶ 4; Rice Declaration, Exh. A attached to Document No. 29, ¶ 12; Humphrey Declaration, Exh. D attached to Document No. 29, ¶ 10. Being questioned at deposition, however, George claimed that "I think it was earlier than that. **Q:** Well, tell me when you recall it happening. **A:** I thought it was in '96 I went back driving. **Q:** But you said you're not sure? **A:** I'm not sure, no." George Dep., pp. 63-64. *See also* Document No. 37, ¶ 4.

Also contested is the cause of Plaintiff's April 2002 accident. Defendant claims it "learned that a law enforcement officer at the scene of the accident reported that Plaintiff had been distracted when he struck the other driver and was at fault in the collision, resulting in Plaintiff being issued a citation and both drivers requiring medical attention." Document No. 28, ¶ 15. Plaintiff denies the accuracy of the officer's report, however. According to his account of the accident, he felt a pain in his chest and the other vehicle then "made a turn without signaling, causing the collision." Document No. 37, ¶ 15. "At the time of impact, Plaintiff lost consciousness and next found himself in a field standing at the accident scene. Plaintiff does not recall the statements attributed to him about being distracted." *Id.*

Lastly, the Parties disagree whether Sharp promised that Plaintiff's position would remain available after the expiration of his FMLA leave. According to the affidavit of Mary George, Plaintiff's spouse, during a conversation on October 4, 2002, "[Sharp] said in terms of [Plaintiff's] job, it was there and everything was fine. She had also told me that his job would be available when [his] health had improved. . . ." Mary George Declaration, Document No. 38-3, ¶ 4. Sharp denies ever committing "to hold [George's] position available for him after the expiration of his

8

FMLA leave." Sharp Declaration, Exh. C attached to Document No. 29, ¶ 10.

## B. Legal Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact." FED. R. CIV. P. 56. "An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citation omitted). Material factual disputes are those "that might affect the outcome of the suit under governing law." *Id.* On a motion for summary judgment, the moving party must first "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). To defeat the motion, "an adverse party may not rest upon the mere allegations or denials of his pleading." *Id.* at 321 n.3. Instead, it must use evidence to "set forth specific facts showing that there is a genuine issue for trial." *Id.* "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513, 91 L. Ed. 2d at 216.

## IV. ANALYSIS

A common refrain in the following analysis was first sounded in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), in which the Supreme Court explicated the burden-shifting paradigm that governs claims under the ADA, as well as ADEA and FMLA claims that proceed without the benefit of direct evidence of discrimination or retaliation. *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 938 (3d Cir. 1997) (addressing claims brought under the ADA and analogous PHRA provisions); *Fasold v. Justice*, 409 F.3d 178, 183-84

9

(3d Cir. 2005) (addressing claims brought under the ADEA and analogous PHRA provisions); *Alifano v. Merck & Co.*, 175 F. Supp. 2d 792, 795 (E.D. Pa. 2001) (addressing an FMLA retaliation claim). According to *McDonnell*, a claimant must first make a *prima facie* case. Once done, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action under scrutiny. *McDonnell Douglas Corp.*, 411 U.S. at 802-03, 93 S. Ct. at 1824-25, 36 L. Ed. 2d at 678. Assuming the defendant so meets the *prima facie* case, the plaintiff can only recover if he establishes that the proffered reasons are in fact pretextual. *Id.* at 804, 93 S. Ct. at 1825, 36 L. Ed. 2d at 679. Application of this framework only varies according to the particular requirements for a *prima facie* case under the different statutes.

## A. Plaintiff's ADEA Claim

As an initial matter, the Court notes that Plaintiff has made no attempt to define the theory of liability on which his ADEA claim proceeds. While claims for intentional discrimination are more common, the Supreme Court has recently held that the ADEA does cognize employer liability in cases of disparate impact. *Smith v. City of Jackson*, 544 U.S. 228, 240, 125 S. Ct. 1536, 161 L. Ed. 2d 410 (2005). A disparate-impact claimant, however, "is responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Id.* at 241, 125 S. Ct. at 1545, 161 L. Ed. 2d at 422 (citations omitted). As the Third Circuit has recently suggested, this language restricts courts from implying allegations of disparate-impact where only an intentional discrimination claim can be reasonably inferred from the complaint. *Seasonwein v. First Montauk Secs. Corp.*, 189 Fed. Appx. 106, 111 (3d Cir. 2006) (nonprecedential opinion). Because George has not suggested anywhere in the record that some facially-neutral policy at Napa had a disparate impact on older workers generally, the Court will

10

only consider whether Defendant discriminated against Plaintiff in particular.

The ADEA protects workers from adverse employment decisions that are motivated or determinatively influenced by the protected trait of age. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S. Ct. 2097, 2105 147 L. Ed. 2d 105, 116 (2000). According to 29 U.S.C. § 623(a), it is unlawful for an employer "to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." In order to make a *prima facie* case of intentional employment discrimination based on age, George must establish four elements: 1) that he is over forty years old, and is thus a member of the protected class; 2) that his employment was terminated; 3) that he was qualified for the position from which he was terminated; and 4) that he "was replaced by a sufficiently younger person to create an inference of age discrimination." *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1108 (3d Cir. 1997) (Alito, J.). The Parties offer no argument regarding the first three elements; Defendant's Motion primarily contends that George is unable to satisfy the ultimate requirement. Document No. 27, p. 16.

"In the context of a reduction in force, in order to satisfy the fourth element of a *prima facie* case under the ADEA, a plaintiff must show that the employer retained a sufficiently younger similarly situated employee." *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 301 (3d Cir. 2004) (citing *Anderson v. Conrail*, 297 F.3d 242, 249-50 (3d Cir. 2002)). Moreover, in discrimination cases generally, "[t]he burden of establishing a *prima facie* case of disparate treatment is not onerous." *Sheridan v. E.I. Dupont de Nemours & Co.*, 100 F.3d 1061, 1084 (3d Cir. 1996) (citing *Tex Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). According to Plaintiff, Defendant's own evidence allows the necessary inference of discrimination: Hazlett was retained as a stockroom worker who occasionally drove a delivery

11

route, while the more senior George was terminated from his substantially-identical position.

Given Plaintiff's relatively low burden at this stage in the *McDonnell* analysis, the evidence is likely sufficient to establish a *prima facie* case of discrimination. However, even assuming as much, George is unable to show that Napa's nondiscriminatory reasons for terminating his employment were pretextual. Defendant claims that it received a directive from corporate headquarters mandating the reduction of the Altoona Operations workforce. In complying, Rice and Humphrey decided that only one delivery driver was needed at the Distribution Center and that all others could be terminated. Considering seniority and performance records, the two retained Taylor, whom they believed to be the most senior driver, and laid off Plaintiff, Behe, and Davis. Rice Declaration, ¶¶ 6-12; Humphrey Declaration, ¶¶ 6-10.

At the third *McDonnell* step, Plaintiff need not produce evidence directly contradicting Napa's proffered legitimate reason for terminating his job. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Rather, George's evidence "must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action." *Id.* (citations omitted). However, it is not sufficient that Plaintiff merely demonstrates that Defendant's "decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765. In its entirety, George's attempt to carry his burden at this stage reads:

> Plaintiff had seniority over both Mr. Taylor and Ms. Hazlett. Employing Defendant's reasoning would result in Plaintiff retaining his job. So, there had to be another reason for Plaintiff being terminated. The only other thing of substance is age and record of disability. Defendant's witnesses say they did not take those factors into account—but what else could there be?

12

Document No. 36, p. 5.

The Court agrees that it is unclear how Rice and Humphrey calculated seniority. The two apparently considered not an employee's date of hire, but the length of time a worker had spent in his current job. Thus, Taylor could be more senior than George, even if Napa hired the former years after the latter. Similarly, though she was clearly junior to Plaintiff, Hazlett was not a candidate for termination because she did not drive an assigned delivery route. That she would be called on to make deliveries after the lay-offs was seemingly irrelevant. However, even construing the ambiguities and inconsistencies in George's favor, and assuming that Plaintiff was in fact the most senior delivery driver, there remain myriad possibilities to explain why he was laid off; there could be mistake, incompetence, or imprudence. Rice and Humphrey also suggested that they considered the blemishes on Plaintiff's driving record, as well as Plaintiff's extended medical absence.[2] The Court cannot find that a poorly-executed reduction strategy sows the kind of disbelief that suggests it is "either a post hoc fabrication or otherwise did not actually motivate the employment action."

In short, Plaintiff's age and termination, combined with an inconsistency in the implementation of Napa's workforce reduction scheme, do not create an inference that Defendant's proffered explanation is pretextual. Furthermore, while Rice and Humphrey did terminate two sixty-six year old employees, they also retained fifty-six year old stockroom worker Faust. Document No. 38-1 (stating Plaintiff's date of birth); Exh. E. attached to Document No. 29, ¶ 5

---

[2] Of course, considering George's medical leave might create liability under the FMLA. *See* Section IV.C, *infra.* However, such a consideration could also mitigate any inference of ageism.

13

(stating Behe's date of birth); Exh. E. attached to Document No. 29, ¶ 8 (stating Faust's date of birth). Moreover, Behe was rehired four months after the layoff. Humphrey Declaration, ¶ 15. Even if Napa retained less senior employees while laying off Plaintiff, George must do more than pose suggestive questions and state conceivable alternative theories. That he has not done so makes summary judgment proper for Defendant.

## B. Plaintiff's ADA Claim

The ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To succeed on Count II, George must first establish a *prima facie* case of discrimination by demonstrating that "he is a disabled person within the meaning of the ADA; he [was] otherwise qualified to perform the essential functions of [his] job, with or without reasonable accommodations by [Napa]; and he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). If accomplished, the Court proceeds with the burden shifting prescribed in *McDonnell. Olson v. GE Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996).

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C). *See also Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996). Federal regulations refine this language: A physical impairment is "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special

14

sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine. . . ." 29 C.F.R. § 1630.2(h)(1). Major life activities that the impairment must affect are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* at § 1630.2(I). A substantial limitation is the inability "to perform a major life activity that the average person in the general population can perform," or a significant restriction "as to the condition, manner or duration under which [the] individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Id.* at § 1630.2(j)(1)(I)-(ii). Courts should consider at least three particular factors when assessing whether or not a limitation is substantial: "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* at § 1630.2(j)(2)(I)-(iii).[3]

The definition of disability is thus a unifying theme that underlies each of the three methods for establishing the first element of a *prima facie* case of disability discrimination. George must

---

[3] The Court, of course, is not necessarily bound to the EEOC guidelines. As the Supreme Court has noted, "the persuasive authority of the EEOC regulations is less clear," in part because no agency was ever given the authority to interpret the meaning of "disability" as it is used in the ADA. *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 194, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002). *See also Collins v. Prudential Inv. & Ret. Servs.*, 119 Fed. Appx. 371, 377 (3d Cir. 2005). Apparently, no court has directly addressed the reasonableness of the regulations, however, and most that have considered the Supreme Court's dicta have not questioned past usage. *See, e.g., Rossbach v. City of Miami*, 371 F.3d 1354, 1357 (11th Cir. 2004) ("Nevertheless, the Supreme Court has previously construed the ADA in light of the EEOC regulations without deciding what deference is due the regulations, and this Court also frequently looks to the EEOC regulations for interpretive guidance."); *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 714 n.10 (8th Cir. 2003) ("However, because neither party challenges the reasonableness of the EEOC regulations, this is an issue that we need not address. Like the Court in *Toyota*, we assume without deciding that the regulations are reasonable.'" (citation omitted)); *Carroll v. Xerox Corp.*, 294 F.3d 231, 239 n.8 (1st Cir. 2002) ("We have, pre-*Toyota Motor*, looked to these EEOC regulations on several occasions for guidance in applying the statutory terms under the ADA."). Courts in this district routinely apply the EEOC's guidelines and, the Parties having offered no objection, this Court feels no need to do differently.

provide evidence that he actually suffered a substantially-impaired major life activity, that he has a record of a substantially-impaired major life activity, or that he was regarded as suffering a substantially-impaired major life activity. Either way, his ADA claim must fail unless there is some admissible account of the extent to which a physical impairment obstructed a specific and qualifying activity, either in the eyes of George's employers, in some record form, or in reality.

Plaintiff has provided no such account. In his response to the Motion *sub judice*, George argues that he "had a broken arm that limited his abilities to lift or carry items, a mini-stroke, and he had an aneurysm that left him with a lack of concentration, bedridden during periods of time and afraid to exert himself for fear that more serious injury would occur." Document No. 36, p. 6. To be sure, there is evidence that Plaintiff suffered injuries in the April 2002 car accident and that those injuries exhibited certain symptoms in the subsequent months. George's wife attests to Plaintiff's inability to work during the period between May 1, 2002, and October 2002: "His right arm was in constant pain, especially with any type of movement or exertion. . . . He was also debilitated by his aneurysm." Declaration of Mary George, ¶ 2. Plaintiff himself states that

> I was told that I had a mini-stroke, as well as rib and right arm injuries. . . . Throughout the time subsequent, my arm continued hurt me [*sic*]. . . . Because my right arm hurt and was in a cast, other people in the stockroom helped me with any lifting that I could not handle. . . . My symptoms, which I believed to be related to my aneurysm . . . were lethargy, dizziness, and inability to concentrate.

George Declaration, Document No. 38-1, ¶¶ 4, 6, 8 & 10. *See also* George Dep, Exh. B attached to Document No. 29, pp. 88, 93-99. However, Mrs. George also states that "I was able to see that [Plaintiff] improved with time." Declaration of Mary George, ¶ 2. George himself claims that his symptoms continued until September 2002 and that by October 4, he "felt well . . . and felt as though I could do my regular job without restrictions. George Declaration, ¶¶ 10-11. Indeed,

16

George received a medical release to full duty without limitations at that time.  Sharp Declaration, ¶ 18; Defendant's Exh. 22 to George Dep., Document No. 29-7, p. 12.

"'Intermittent, episodic impairments are not disabilities, the standard example being a broken leg.'" *McDonald v. Pennsylvania*, 62 F.3d 92, 95-96 (3d Cir. 1995) (quoting *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995)).  While George need not show that his disability is permanent, "impairments of a temporary nature with little or no long term or permanent impact, cannot as a matter of law substantially limit an individual in a major life activity." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 765 (3d Cir. 2004).  Aside from the extraordinarily thin evidence that George experienced any impaired life activity, Plaintiff managed a full recovery within a matter of months.  Any impairment, even if severe in nature, was thus of a short duration and threatened no permanent or long-term impact. 29 C.F.R. § 1630.2(j)(2).  George is therefore incapable of establishing an actual disability or a record of such a disability within the meaning of the ADA.

At this stage in the litigation, Plaintiff must do more than simply claim that he meets the statutory requirements for disability.  George has not identified any major life activity or suggested that one was substantially impaired, had a record of being substantially impaired, or was regarded as being substantially impaired.  He therefore cannot establish an actual disability, a record of one, or a perception of one, and his ADA claim cannot survive.

## C. Plaintiff's FMLA Claim

One purpose of the FMLA is to "entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(2).  Accordingly, the law allows employees up to twelve weeks of protected medical leave per twelve-month period.  29 U.S.C. § 2612(a)(1).  In addition, the

Department of Labor has interpreted the FMLA in such a way that employers are "prohibited from discriminating against employees or prospective employees who have used FMLA leave." 29 C.F.R. § 825.220(c). *See also Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 146-48 (3d Cir. 2004) (applying § 825.220 and discussing with approval a Ninth Circuit case that upheld the regulation's validity). Two particular species of FMLA cases have thus evolved: failure-to-advise claims, which stem from § 2612(a)(1), and retaliation claims based on § 825.220. *Conoshenti*, 364 F.3d at 140-48.

In his Complaint, Plaintiff alleged that "he was retaliated against by Defendant for having been on Family Medical Leave status." Document No. 1, ¶ 25. There are two methods by which a claimant might prevail on a retaliation claim. In a pretext case, a plaintiff relies on circumstantial evidence to "show that (1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave." *Conoshenti*, 364 F.3d at 146. The analysis from that point proceeds under *McDonnell* and Napa must provide a legitimate, nondiscriminatory reason for George's termination. *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001); *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir. 2001); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001); *Brungart v. Bellsouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000); *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999); *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998); *Alifano v. Merck & Co.*, 175 F. Supp. 2d 792, 795 (E.D. Pa. 2001); *Baltuskonis v. US Airways, Inc.*, 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999).

Alternatively, Plaintiff might present a mixed-motive case, in which he provides direct evidence that discriminatory animus had a determinative effect in the adverse employment decision.

The Court must then shift the burden to Napa under the auspices of *Price Waterhouse v. Hopkins*,

490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989). *Conoshenti*, 364 F.3d at 147; *Watson v.*

*SEPTA*, 207 F.3d 207, 214-15 (3d Cir. 2000) (describing mixed-motive analysis). Under *Price*

*Waterhouse*,

> the employee must produce direct evidence of discrimination, i.e., more direct
> evidence than is required for the [*McDonnell*] *prima facie* case. If the employee
> does produce direct evidence of discriminatory animus, the employer must then
> produce evidence sufficient to show that it would have made the same decision if
> illegal bias had played no role in the employment decision.

*Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 n.4. (3d Cir. 1995) (citations omitted).

Accordingly, if there is direct evidence of the causal connection between Plaintiff's FMLA leave

and his termination, then Napa must prove by a preponderance of the evidence that George would

have been fired even in the absence of any retaliatory intent. *Price Waterhouse*, 490 U.S. at 261,

109 S. Ct. at 1796, 104 L. Ed. 2d at 295.[4]

### 1. Pretextual Retaliation

There is no dispute that Plaintiff was on FMLA leave and was terminated, thus satisfying

the first two elements of a *prima facie* pretext case. However, George makes no argument that a

causal connection existed between his FMLA leave and his termination. His response to the

Summary Judgment motion merely recites the applicable standard and, skipping the first two steps

in *McDonnell*, states that "Plaintiff claims that Plaintiff's termination was pretextual as set forth in

---

[4] The Court finds that *Conoshenti* makes application of *Price Waterhouse*'s mixed-motive framework to FMLA retaliation claims an obvious conclusion. Though *Price Waterhouse* itself was superceded by elements of the Civil Rights Act of 1991, that Act does not apply to the FMLA. *Conoshenti*'s adoption of mixed-motive analysis can therefore borrow straight from the opinions in *Price Waterhouse*—namely those of the plurality and Justice O'Connor—and the affirmative defense of disproving but-for causation is still available to Napa. *Cf. Woodson v. Scott Paper Co.*, 109 F.3d 913, 935 (3d Cir. 1997) (holding that the 1991 Act does not apply to retaliation claims).

the age discrimination discussion." Document No. 36. On its own investigation of the record, the Court finds no reason to ask Defendant for a legitimate, nondiscriminatory reason for its decision.

"[I]n cases where a plaintiff must illustrate a 'causal link' for purposes of establishing retaliation . . . a plaintiff may rely upon a broad array of evidence to do so." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 283-84 (2000). "Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the *prima facie* case through other types of circumstantial evidence that support the inference." *Id.* at 280-81. There are not "exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Kachmar v. Sungard Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997).

The proffered evidence creates no suspicion of discrimination. The directive requiring a workforce reduction and the subsequent method by which Rice carried through that reduction militates against any finding of animus. Even if, as Plaintiff claims, Napa incorrectly carried out its seniority-based reduction, that does not mean George's termination was ultimately attributable to retaliation. There is no pattern of antagonism and the only piece of circumstantial evidence that might favor Plaintiff is temporal proximity; George was terminated only three months after his FMLA leave ended.

Temporal proximity alone, however , does not establish causality unless it is unusually suggestive. *Farrell*, 206 F.3d at 280. Though suggestiveness is highly sensitive to the facts of each case, the Third Circuit has suggested that a three month gap "is not so close as to be unusually suggestive of retaliatory motive, especially where an obvious and unimpeached non-retaliatory motive exists." *C.M. v. Bd. of Educ.*, 128 Fed. Appx. 876, 883 (3d Cir. 2005) (nonprecedential

opinion). *See also Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760-61 (3d Cir. 2004) (holding that a two-month period, by itself, was not unusually suggestive); *Coppa v. Am. Soc'y for Testing Materials*, No. 04-234, 2005 U.S. Dist. LEXIS 8737, at *7 (E.D. Pa. May 11, 2005) (concluding that a three-month period, by itself is not unduly suggestive); *Galle v. Dep't of Gen. Servs.*, No. 02-4622, 2003 U.S. Dist. LEXIS 4548, at *18 (E.D. Pa. March 18, 2003) (same). The legitimate reasons Napa has advanced to explain Plaintiff's termination mitigate any suggestiveness in the proximity of that termination to George's FMLA leave, rendering unnecessary any further inquiry as to whether George has stated a *prima facie* case of retaliation.

### 2. Mixed-Motive Retaliation

As Justice O'Connor stated in her *Price Waterhouse* opinion, direct evidence demonstrates "that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse*, 490 U.S. at 277, 109 S. Ct. at 1805, 104 L. Ed. 2d at 305 (O'Connor, J., concurring). Reviewing the record without benefit of argument from Plaintiff, the Court finds only one indication that Plaintiff's FMLA leave influenced Napa's decision-making: "The recommendation to eliminate three [stockroom delivery drivers] was because of the fact that there was not a need for multiple persons performing deliveries. In that regard, we considered that Mr. George's former position had been vacant for almost six months." Rice Declaration, ¶ 9; Humphrey Declaration, ¶ 8. Rice also stated that he "determined to eliminate [George's] position, which he had not returned to following the expiration of his FMLA leave, and which consisted of performing deliveries with respect to an assigned route since only June of 1997." Rice Declaration, ¶ 12. *See also* Humphrey Declaration, ¶ 10 (making a similar comment regarding his recommendation that Napa terminate Plaintiff).

This evidence only suggests that Plaintiff's FMLA leave indicated to Napa which jobs were over-staffed. George's six-month absence did not engender retaliatory sentiments in his supervisors, but revealed to them the superfluity of additional delivery drivers. Faced with a need to reduce their payroll, this information influenced only the decision regarding which positions to terminate; business operations at the Distribution Center had apparently not suffered with a reduced number of delivery drivers. Which particular employees would feel the brunt of that choice was then a factor of seniority, with some consideration also given to past performance. Rice Declaration, ¶¶ 11-12; Humphrey Declaration, ¶¶ 9-10. Though his FMLA leave thus played some role in Defendant's workforce reduction, Plaintiff's termination was thus the product of neutral considerations. Rice's additional comment that George had not returned to work also raises no inference that Napa placed "substantial negative reliance" on Plaintiff having taken FMLA leave. Rather, it only suggests that Plaintiff's failure to return to work *after* that period ended may have been a factor in his termination. That is not the kind of direct evidence of retaliation that could trigger a *Price Waterhouse* analysis and shift the burden to Defendant. That Plaintiff's FMLA leave withered on the *McDonnell* vine is therefore determinative on the issue of summary judgment.

## D. Plaintiff's Title VII Claim

As Defendant notes, Title VII prohibits discrimination on the basis of gender, race, color, religion, or national origin, as well as retaliation for complaining of such discrimination. 42 U.S.C. §§ 2000e-2–2000e-3. This Court has observed that Title VII does not protect against discrimination on the basis of age or disability. *Price v. Schwan's Home Servs., Inc.*, No. 05-220, 2006 U.S. Dist. LEXIS 16085, at **9-10 (W.D. Pa. Mar. 31, 2006) (citing *Orell v. Umass Mem'l Med. Ctr. Inc.*,

203 F. Supp. 2d 52, 59-60 (D. Mass. 2002)).  Plaintiff does not dispute that Title VII affords him no protection and the Court will grant Defendant summary judgment as to this claim.  Document No. 36, p.7.

**E. Plaintiff's PHRA Claim**

In evaluating discrimination claims under the PHRA, Pennsylvania courts have adopted the legal framework that federal courts follow when analyzing ADA and ADEA claims.  *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933 (3d Cir. 1997) (addressing claims brought under the ADA and analogous PHRA provisions); *Fasold v. Justice*, 409 F.3d 178, 183-84 (3d Cir. 2005) (addressing claims brought under the ADEA and analogous PHRA provisions).  The grant of summary judgment against Plaintiff's discrimination claims is thus fatal to George's PHRA claims.

## V. CONCLUSION

For the reasons set forth in the foregoing analysis, the Court shall grant Defendant's Motion for Summary Judgment as to all claims.  An appropriate Order follows.

23

**AND NOW**, this 25th day of January, 2007, this matter coming before the Court on Defendant's Motion for Summary Judgment (Document No. 26), **IT IS HEREBY ORDERED** that the Motion is **GRANTED** in its entirety. Accordingly, the Clerk of Court shall enter judgment in favor of the Defendant and against Plaintiff Harry L. George.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

**Cc: All counsel of record**

24